**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. José R. Almonte |
| v. | : | Mag. No. 26-16210 (JRA) |
| MABED PATRICIA UTATE-ALBERTO, a/k/a "Mabed Alberto Utate," PATRICIA ARISLEYDI PEREZ, and GEORGE ARTURO ALFAU MENDEZ, a/k/a "George Alfau" | : | **AMENDED CRIMINAL COMPLAINT** **<u>Filed Under Seal</u>** |

I, Daniella M. Ganiaris, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

SEE ATTACHMENT B

continued on the attached page and made a part hereof.

*s/ Daniella M. Ganiaris*

Special Agent Daniella M. Ganiaris
Federal Bureau of Investigation

Special Agent Ganiaris attested to this Complaint by telephone pursuant to FRCP 4.1(b)(2)(A).

Sworn to and subscribed via telephone, this 20th day of October, 2026

DISTRICT OF NEW JERSEY
County and State

*s/ Hon. José R. Almonte, U.S.M.J.*

HONORABLE JOSÉ R. ALMONTE
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

ATTACHMENT A

**Count 1**
**(Wire Fraud Conspiracy)**

From in or about March 2021 to at least in or about January 2026, in the District of New Jersey and elsewhere, defendants

MABED PATRICIA UTATE-ALBERTO,
a/k/a "Mabed Alberto Utate,"
PATRICIA ARISLEYDI PEREZ, and
GEORGE ARTURO ALFAU MENDEZ,
a/k/a "George Alfau"

did knowingly and intentionally conspire and agree with each other and others to devise a scheme and artifice to defraud the United States Department of Education and others and obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice to defraud, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Section 1349.

ATTACHMENT B

I, Daniella M. Ganiaris, a Special Agent with the Federal Bureau of Investigation, personally participated in the investigation of this matter, having reviewed, among other materials, telephone records, electronic communications, statements made or reported by various witnesses with knowledge of the facts, and financial records, have knowledge of the following facts. Because this Complaint is submitted for the limited purpose of establishing probable cause, I have not included all facts known to me concerning this investigation. The contents of documents and the statements and conversations of individuals referenced below are provided in substance and in part, unless otherwise indicated. Where I assert that an event took place on a particular date and time, I am asserting that it took place on or about the date and time alleged. Dollar amounts, and other figures cited herein, are approximations.

**Relevant Individuals and Entities**

1. At all times relevant to this Criminal Complaint:

a. Defendant MABED PATRICIA UTATE-ALBERTO, a/k/a "MABED ALBERTO UTATE," ("UTATE") was a resident of Burlington County, New Jersey and the user of the cellular phone referred to herein as the "Utate Phone."

b. Defendant PATRICIA ARISLEYDI PEREZ ("PEREZ") was a resident of Camden County, New Jersey, and the user of the cellular phone referred to herein as the "Perez Phone."

c. Defendant GEORGE ARTURO ALFAU MENDEZ, a/k/a "GEORGE ALFAU," ("ALFAU") was a resident of Burlington County, New Jersey and the user of the cellular phone referred to herein as the "Alfau Phone."

d. Co Co-Conspirator-1 and Co-Conspirator-2 were participants in the scheme and artifice to defraud who were located in Kenya and who were associated with a Kenyan-based safari company (the "Co-Conspirator Company").

e. The United States Department of Education ("ED") was an executive department of the United States established to promote education. One of ED's primary responsibilities was oversight and administration of the Federal Student Aid program ("FSA program") to assist qualified students in obtaining post-secondary education. The FSA program was funded by U.S. taxpayers.

f. Institution-1 was a college located in the United States that was accredited to receive funds from the FSA program on behalf of its enrolled students.

g. Institution-2 was a college located in the United States that was accredited to receive funds from the FSA program on behalf of its enrolled students.

h. Institution-3 was a college located in the United States that was accredited to receive funds from the FSA program on behalf of its enrolled students.

i. Institution-4 was a college located in the United States that was accredited to receive funds from the FSA program on behalf of its enrolled students.

## Background on Federal Student Aid

2. ED operated, administered, and regulated several FSA programs including the Federal Direct Loan program, Federal Pell Grant program, and the Higher Education Emergency Relief Fund ("HEERF"). Students who received a Federal Direct Loan were required to repay the loan. Federal Pell Grants assisted undergraduate students from low-income households with exceptional financial need and did not need to be repaid. HEERF provided economic relief to undergraduate students during the COVID-19 pandemic and did not need to be repaid.

3. ED regulations required that students meet the following criteria, among others, to be eligible for FSA program funds: a) be enrolled in or accepted for enrollment at, an eligible program seeking a degree or certificate at an eligible institution; b) have a high school diploma or its recognized equivalent; and c) demonstrate satisfactory progress in his or her course of study.

4. Eligible students could apply for federal student financial aid by completing a Free Application for Federal Student Aid ("FAFSA") form, which was typically submitted online in electronic format. All online FAFSA applications were processed through computer servers located in Virginia.

5. In order to complete and submit the FAFSA form electronically, an applicant was required to obtain a user ID called a Federal Student Aid Identification ("FSAID") and establish a password. Each FAFSA applicant was assigned a unique FSAID.

6. The FAFSA form required the applicant to provide personal information including date of birth, social security number, address, email address, telephone number, asset and income information, and education history.

7. From 2019 through 2024, the FAFSA form included an explicit warning that using an assigned "FSAID (username and password) and/or any other credential" constituted a certification that the applicant was the individual

associated with that credential and had not disclosed it to anyone else. It further warned that purposely providing "false or misleading information" may result in criminal penalties.

8. The current FAFSA form, which became effective in 2024, requires the applicant to certify, "under the penalty of perjury under the laws of the United States of America, that the information . . . provide[d] on the FASA form is true and correct," and it warned "that any falsification of this statement" is criminally punishable, including the knowing and willful request for or acquisition of records pertaining to an individual under false pretenses." The FAFSA form further required the applicant to certify that they "are the person identified," and again warned that purposefully giving "false or misleading information" may subject them to criminal penalties.

9. The FAFSA form also included a statement and warning advising all applicants that FSA program funds could only be used to pay specific costs associated with attending a higher-level educational institution. Approved expenditures of FSA program funds included tuition, fees and expenses such as books, supplies, transportation, and related living expenses. To help ensure FSA program funds were used only for educational purposes, ED transmitted approved FSA program funds directly to educational institutions where students were enrolled—not directly to students themselves – to cover such items as tuition and fees.

10. Because FSA program awards often exceeded the cost of a student's tuition and fees, the FSA program rules directed recipient institutions to remit any excess funds to the applicable student. Such payments were commonly called credit refunds. Schools typically disbursed credit refunds to students via a direct deposit to a designated bank account, by check, or through a third-party servicer that mailed pre-paid debit cards to the student.

## **Overview of the Scheme and Artifice to Defraud**

11. Beginning in or about 2021, community colleges and universities across the United States identified fraudulent Free Application for Student Aid ("FAFSA") applications that resulted in the disbursement of FSA program refunds to bank and other financial accounts opened in the names of individuals other than the students who had actually applied for the FSA program funds in the first instance.

12. Conspirators used stolen personally identifiable information ("PII") to create FAFSA IDs for "ghost students" in order to fraudulently obtain FSA program funds. These "ghost students" were American citizens whose identities were stolen and whose PII was obtained and used without their permission in order to apply for

and receive FSA program funds. The "ghost students" never attended the college classes for which those funds were awarded.

13. The conspiracy involved perpetrators located both inside and outside the United States, including individuals in Kenya who directed or worked with U.S.-based co-conspirators, including Co-Conspirator-1 and Co-Conspirator-2.

14. The conspiracy relied heavily on the use of interstate and foreign wire communications.

15. In total, this scheme affected educational institutions in multiple states, including New Jersey, and resulted in over $100 million in actual loss to the ED.

16. The U.S.-based co-conspirators, referred to herein as "money mules," used U.S. bank accounts to receive stolen FSA program funds obtained through the ghost student fraud scheme. After these U.S. bank accounts received the stolen FSA program funds, the money mules—after taking their cut—would transfer the funds overseas using wire transfers and various remitting and/or international wiring companies, including but not limited to Wise, Remitly, and MoneyGram.

17. Defendants UTATE, PEREZ, and ALFAU (collectively, the "Defendants") all acted as witting money mules by using multiple U.S. bank accounts for the purpose of receiving fraudulently obtained FSA program refunds that were issued in the names of identity-theft victims. Then, the Defendants – at times, individually, and at times, working together – transferred those fraudulently-obtained funds to Co-Conspirator-1 and Co-Conspirator-2 using bank wires and money service businesses.

**<u>Object of the Conspiracy</u>**

18. It was an object of the conspiracy for the co-conspirators to enrich themselves through stolen FSA program funds received through the ghost student fraud scheme. These funds would be shared among the money mules and the co-conspirators who utilized the PII of the students whose identities were stolen ("Identity Theft Victims") to pose as ghost students in order to apply for the FSA program funds.

**<u>Manner and Means of the Conspiracy</u>**

19. It was part of the conspiracy that:

a. Co-conspirators would obtain, possess, and transfer – or cause to be obtained, possessed, and transferred, the PII of the Identity Theft Victims, without lawful authority.

b. Co-conspirators used and caused to be used Identity Theft Victims' PII, to include names, social security numbers, dates of birth, and other means of identification, in FAFSA applications to apply for financial aid, purportedly on behalf of the Identity Theft Victims.

c. Co-conspirators created and caused the creation of false and fraudulent ED FSAID accounts and passwords in the name of Identity Theft Victims for the purpose of fraudulently obtaining FSA funds.

d. Co-conspirators filed and caused the filing of materially false and fraudulent FAFSA applications to ED, which caused the transmission of interstate and foreign wire transmissions.

e. Co-conspirators used and caused the use of the Identity Theft Victims' PII to enroll in U.S. higher education institutions that offered online classes and accepted ED federal student aid.

f. Co-conspirators caused ED to disburse federal student aid to U.S. higher educational institutions based on the materially false and fraudulent representations and promises made in FAFSA applications.

g. Co-conspirators caused educational institutions to issue credit refunds of FSA program funds to financial accounts under the custody and control of the co-conspirators, including accounts controlled by UTATE, PEREZ, and ALFAU.

h. UTATE, PEREZ, and ALFAU opened and/or used financial accounts under their control to receive, deposit, and transfer FSA program funds. For example, UTATE maintained multiple bank accounts (the "Utate Accounts") that received multiple deposits of FSA program funds, which totaled more than $1 million and were linked to over 300 ghost students. PEREZ maintained multiple bank accounts (the "Perez Accounts") that received multiple deposits of FSA program funds, totaling more than approximately $250,000 and linked to at least 88 ghost students. ALFAU maintained multiple bank accounts (the "Alfau Accounts") that received multiple deposits of FSA program funds, totaling more than $119,187 and linked to over 40 ghost students. ALFAU and UTATE maintained at least one joint checking account (the "Utate-Alfau Account") that served as a shell, or "passthrough" account for FSA program funds received from the Utate Accounts in that over $240,000 of funds were transferred from the Utate-Alfau Account to Co-Conspirator 1 and Co-Conspirator 2 from in or about July 2022 through in or about July 2025.

i. UTATE, PEREZ, and ALFAU used remitting and/or international wiring companies and electronic payment platforms, including MoneyGram,

Remitly, Western Union, and Wise, to transfer and disburse FSA program funds to co-conspirators, including Co-Conspirator-1 and Co-Conspirator-2.

j. Co-Conspirators, including UTATE, PEREZ, ALFAU, Co-Conspirator-1, and Co-Conspirator-2, shared in the proceeds of the fraud.

k. Co-Conspirators, including UTATE, PEREZ, ALFAU, Co-Conspirator-1, and Co-Conspirator-2, used and cause the use of encrypted electronic messaging, such as WhatsApp,[1] to communicate.

l. Co-Conspirators, including UTATE, PEREZ, ALFAU, Co-Conspirator-1, and Co-Conspirator-2, further misrepresented, concealed, hid, and caused to be misrepresented, concealed, and hidden, acts done in furtherance of the conspiracy.

20. In furtherance of the conspiracy and to effect its unlawful object, the Defendants committed the following acts, among others, in the District of New Jersey and elsewhere:

a. On or about March 5, 2021, during a text message exchange with UTATE, PEREZ appeared confused as to why funds related to Institution-1 had appeared in her account and she and UTATE worried that her account had been hacked. PEREZ wondered, "Why would someone from NJ study at community college in California?" Later that same day, PEREZ wrote, "That money is [Co-Conspirator-1's] Hahahaha" and UTATE responded, "Oh my God But it's a good thing it wasn't fraudulent at all." PEREZ responded, "Because he told me later that he was going to get some money[.] I almost killed him[.] I told him you have to tell me because I was going to report him[.]" Based on my training and experience, and the investigation to date, I believe that PEREZ was indicating to UTATE that she was not upset that Co-Conspirator-1 had used her account to receive money from a community college but rather was upset that he hadn't told her prior to doing so, thus risking that PEREZ might report his conduct to the bank as suspected fraud. Further, I believe that this conversation marked the beginning of PEREZ and UTATE's involvement in the conspiracy.

b. Over the following approximately five years, hundreds of deposits of FSA program funds relating to ghost students were deposited into the Utate, Perez, and Alfau Accounts and soon after, UTATE, PEREZ, and ALFAU conducted financial transactions to transfer large portions of these funds to Co-

---

[1] WhatsApp, which is owned by Meta Platforms, Inc., is a secure messaging and social media application. It allows users to send text messages, voice messages, and video messages, make voice and video calls, and share images, documents, user locations, and other content. To register, a user must provide a cellular telephone number. It is a cross-platform application available for devices using Apple iOS, Android, Windows, and macOS operating systems.

Conspirator-1 and Co-Conspirator-2. Examples of these transactions are set forth below.

c. On or about June 23, 2021, approximately $1,000 of FSA program funds were deposited into one of the Perez Accounts, with an associated memo that included the name of a ghost student.

d. Later in the day, PEREZ used Wise to send Co-Conspirator-1 approximately $1,000.

e. On or about May 10, 2023, approximately $3,448.00 of FSA program funds were deposited into one of the Utate Accounts, with an associated memo that included the name of a ghost student and the acronym for Institution-2.

f. Later in the day, UTATE used MoneyGram to wire approximately $1,146.78 to Co-Conspirator-2.[2]

g. On or about July 28, 2023, approximately $2,351 of FSA program funds were deposited into one of the Alfau Accounts, with an associated memo that included the name of a ghost student and a portion of the name of Institution-3.

h. Later in the day, a transfer of approximately $2,141.43 was conducted from the same Alfau Account referenced in subparagraph "g," above, to an account maintained by the Commercial Bank of Africa and associated with the Co-Conspirator Business.

i. From on or about January 3, 2023 through on or about February 1, 2025, UTATE used Wise to transfer over $1.2 million to Co-Conspirator-2. On or about March 30, 2023, a Wise representative emailed UTATE, asking for "additional information about your transfers to [Co-Conspirator-2] and requested that UTATE answer the following questions: (a) provide the nature of your relationship between yourself and [Co-Conspirator-2]; (b) what is the purpose of payments to [Co-Conspirator-2]; (c) you have sent multiple transfers to [Co-Conspirator-2] in a short space of time, please clarify the reason for doing this, rather than sending fewer larger transfers." The email also explained, "[t]his is necessary because we're a regulated financial institution. Bear in mind, we're obligated to collect this information from you within 2 working days – otherwise, we might not be able to help you with future transfers." UTATE eventually responded to this and similar requests on or about April 23, 2024, claiming in part that UTATE was a "local agent" for Co-Conspirator-2's "tourism business which is based in Kenya," and that she "directly receive[s] payments from our clients which I [in]

[2] Financial records revealed that Co-Conspirator-2 ultimately received approximately $1,122.14, likely due to service and exchange fees.

turn channel to her after deducting my commission as per my contract." UTATE provided Wise with examples of invoices related to Co-Conspirator-2's safari business. While the investigation has revealed that Co-Conspirator-1 is associated with a Kenyan safari business, a review of financial records and New Jersey Department of Labor records associated with UTATE revealed no connection between UTATE and work in the travel industry. Thus, based on my training and experience and the investigation to date, I believe that UTATE provided the Wise representative with a false explanation for the suspicious transfers in order to conceal the true nature of the funds and the true reason for the transfers, specifically, that UTATE was serving as a witting money mule in the conspiracy and that the funds sent to Co-Conspirator-2 were proceeds of the conspiracy.

j. On or about October 3, 2025, in a group WhatsApp chat involving UTATE, Co-Conspirator-1, and PEREZ, UTATE wrote, "Patricia hello," and PEREZ responded, "What's up[.]" UTATE asked, "Can you check if you have received 1K between [y]esterday and today," and PEREZ responded, "Just checked I haven't." UTATE thanked PEREZ and asked her, "Please keep an eye out."

k. On or about October 4, 2025, in the same group chat referenced in subparagraph "j," above, UTATE sent the following screenshot, with the question, "amigo, this is yours?":




Co-Conspirator-1 responded, "correct."

l. On or about October 4, 2025, UTATE then sent the following screenshot, followed by the message, "Only thing that Patricia has received:"




Based on my training and experience, and the investigation to date, I believe that UTATE is asking Co-Conspirator-1 whether the financial transaction captured in the above screenshot was related to the conspiracy, and informing Co-Conspirator-1 that "Patricia" – *i.e.*, PEREZ, hasn't received additional funds. Further, I recognize that this transaction relates to FSA program funds because the acronym "ECSI" relates to a financial services company that manages college loans and other

tuition-related financial transactions.. Last, a review of the Perez Account revealed that the deposit captured in the screenshot above was made to the Perez Account.

m. In response to UTATE's message, on or about October 4, 2025 Co-Conspirator-1 wrote, "Lets wait for the coming week to[] see if [the] other amounts come in[.]" Later that same date, UTATE sent the following message, followed by the phrase, "[t]his account is clear:"

From: [redacted]@s.whatsapp.net Mabed Patricia (owner)
To: [redacted]@s.whatsapp.net [redacted]
To: [redacted]@s.whatsapp.net Patricia Perez

$250 received
$250/7=$17.50
$250-$17.5=$232.50
$226.51 send on money gram and $5.99 was the fee

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] | 10/4/2025 3:58:32 PM(UTC+0) | 10/4/2025 4:02:13 PM(UTC+0) | |
| [redacted]@s.whatsapp.net Patricia Perez | 10/4/2025 3:58:32 PM(UTC+0) | 10/4/2025 3:59:46 PM(UTC+0) | |

Status: Read
Platform: Mobile

10/4/2025 3:58:30 PM(UTC+0)

Based on my training and experience and the investigation to date, I believe that PEREZ, UTATE, and Co-Conspirator-1 were using WhatsApp on or about October 4, 2025 to discuss the receipt and disbursement of funds obtained pursuant to the conspiracy. Further, I believe that, in the electronic message captured in the screenshot directly above, UTATE was calculating the portion of the illegally obtained FSA program funds that were to be provided to Co-Conspirator-1 by PEREZ.

n. On or about October 4, 2025, in accordance with UTATE's instructions, as set forth in the screenshot captured in subparagraph "m," above, PEREZ used MoneyGram to wire $226.51 to Co-Conspirator-1.

o. On or about November 13, 2025, during a WhatsApp group chat involving UTATE, ALFAU, and Co-Conspirator-1, Co-Conspirator-1 sent the following screenshot from what appears to be a college website, associated with a ghost student whose name is redacted here (the "Student"), and which references an expected loan payment of $1,166:




p. On or about November 13, 2025, ALFAU responded to the message detailed in subparagraph "o," above, by sending the following screenshot, which appears to be confirmation of ALFAU's receipt of $1,166, along with the word, "received:"




The screenshot included the words "[Institution-4] NBS refund." A review of records related to the Alfau Account to which these funds were deposited revealed that the full memo associated with this transaction also included the name of the Student. Thus, based on my training and experience and the investigation to date, I believe that, by sending the first screenshot, Co-Conspirator-1 was alerting ALFAU and UTATE that ALFAU would be receiving a payment of FSA program funds and that, by sending the second screenshot, ALFAU was confirming receipt of the payment.

q. On or about November 13, 2025, UTATE used WhatsApp to message ALFAU and Co-Conspirator-1: "$1,166 received $1,166/7 = $81.62 $1,166-$81.62 = $1,084.38."

r. On or about November 13, 2026, ALFAU responded to the message detailed in subparagraph "q," above, by writing, "$1,076.39 send on western union and $7.99 was the fee, account clear." Co-Conspirator-1 responded, "Thank you."